JUDGE KATHLEEN CARDONE

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FILED
2021 FEB -4  AM 9: 38
CLERK US DISTRICT COURT
ESTERN DISTRICT TEXAS
BY _____
DEPUTY

| | |
|---|---|
| **BRANDON CALLIER,** §<br>§<br>§<br>**Plaintiff,** §<br>§<br>**v.** §<br>§<br>**SUMMIT HORIZON FINANCIAL SERVICES,** §<br>LLC, a Georgia Limited Liability Company and §<br>**MORRIS LOBE** §<br>§<br>**Defendants.** §<br>§ | **EP21CV0023** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1. The Plaintiff is BRANDON CALLIER, a natural person, and was present in Texas for all calls, in this case in El Paso County.

2. Defendant SUMMIT HORIZON FINANCIAL SERVICES, LLC ("Summit") is a Georgia Limited Liability Company and can be served via registered agent INCORP Services, Inc. at 9040 Roswell Road, Suite 500, Atlanta, Georgia, 30350.

3. Defendant MORISS LOBE ("Lobe") is a natural person, resident of Georgia, and the Chief Executive Officer of Summit Horizon Financial Services, LLC and can be served at 503 E. Green Street, Bainbridge, Georgia 39819.

**JURISDICTION AND VENUE**

4. <u>Jurisdiction</u>. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v.*

*Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

5. **Personal Jurisdiction.** This Court has general personal jurisdiction over the defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

6. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District. Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

7. This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above-named defendants to the Plaintiff, a Texas resident.

### THE TELEPHONE CONSUMER PROTECTION
### ACT OF 1991, 47 U.S.C. § 227

8. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

9.  The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

10. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

11. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

12. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

13. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

14. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

15. The FCC also recognizes that "wireless customers are charged for incoming calls whether

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

16. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

17. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

18. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

19. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

946, 951 – 52 (9th Cir. 2009).

20. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code 305.053

21. The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

22. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

### FACTUAL ALLEGATIONS

23. Plaintiff's number has been on the national Do Not Call registry for 17 years.

24. The Plaintiff has received at least 24 calls and texts over eight (8) days to his cell phone, 915-245-4374 without consent and not related to an emergency purpose, soliciting the "Student Loan Forgiveness" products and services of Defendant Summit.

25. The Plaintiff did not want or need student loan forgiveness. However, in order to cease harassment from the anonymous robocallers, such as the Defendants, Plaintiff told the representative he needed student loan forgiveness for the sole purpose of identifying who was calling and/or the company who was responsible for calling.

26. On one such phone call Plaintiff received a phone call from Defendants who pretended to be part of the United States Department of Education.

27. On February 1, 2021 Plaintiff received a phone call showing (915) 324-6895 on the caller ID. Plaintiff answered the phone and said hello three times before the call was connected to an agent.

28. Defendant's agent asked Plaintiff personal questions such as his date of birth to gather information in an attempt to access Plaintiff's federal account at Studentaid.gov.

29. Defendant's agent reset Plaintiff's Studentaid.gov password without permission by causing a verification code to be sent via text message to Plaintiff's cell phone and asking Plaintiff to read the verification code to the Defendant's agent.

30. The Defendant's agent used this verification code to access the Plaintiff's Studentaid.gov account without Plaintiff's knowledge or permission.

31. Defendants did not tell Plaintiff the reason for the verification code being sent to Plaintiff or why they needed Plaintiff to tell them the verification code.

32. Defendants accessed Plaintiff's account and viewed his personal information without permission in an attempt to trick Plaintiff into hiring Defendants.

33. The Defendant's agent then provided Plaintiff with the username and password she had just changed on Plaintiff's account.

34. Defendant's agent then said they were going to connect Plaintiff to a "financial advisor" and asked Plaintiff to remain on the call and not hang up.

35. Plaintiff was then transferred to "Ron" who said he was a supervisor.

36. "Ron" then took Plaintiff's information and attempted to enroll Plaintiff in the Defendant's services by asking Plaintiff for his income, marital status, family size, defendants, monthly

6

student loan payment and whether Plaintiff could afford the monthly payment.

37. "Ron" informed Plaintiff he had a "payment plan for him based on his income and family size."

38. "Ron" told the Plaintiff "the first three months you have to pay $500 for three months and after that your payment will become $634."

39. "Ron" did not disclose to Plaintiff the three $500 payments would be made to Defendant Summit and incorrectly led Plaintiff to believe the payments would be applied to his student loan balance.

40. "Ron" then asked Plaintiff to provide his credit card information so he could send Plaintiff a contract. Plaintiff gave the information to "Ron."

41. "Ron" then sent Plaintiff a contract from Defendant Summit. It was at this point Plaintiff learned who was behind the calls. At no time during any of the phone calls did the Defendant's agents correctly identify who they were calling on behalf of.

42. Plaintiff read the contract and discovered the three $500 payments the Defendant's wanted Plaintiff to make would be going to Defendant Summit and not applied to his student loan balance.

43. Plaintiff told "Ron" he needed to review the contract and would "get back with you."

44. On February 1, 2021 Plaintiff received a phone call from phone number (760) 378-8490. Plaintiff answered the phone and was connected to "Jennifer." "Jennifer" asked Plaintiff to remain on the call while she connected him to "Ron."

45. On February 1, 2021 Plaintiff received a phone call from phone number (786) 688-7656. Plaintiff answered the phone and said hello before being connected to "Frank."

46. Frank said "This is Frank with your student loan company. You have been speaking to my

7

representative Ron.  We're going to complete your verification."

47. On February 2, 2021 Plaintiff received four phone calls and five text messages from "Ron" using phone number (760) 378-8490 attempting to get Plaintiff to sign the contract.  Plaintiff told "Ron" he would return the contract if he were interested.

48. On February 2, 2021 Plaintiff received a phone call from (954) 328-5930.

49. Plaintiff answered the phone and said hello three times before there was an audible beep and Plaintiff was connected to "Rachel" who said she was "the head supervisor at the Student Loan Advocates Office."

50. On January 26, 2021 Plaintiff received a missed call from (954) 628-5930.

51. "Rachel" solicited Plaintiff for Defendant's services.

52. On January 29, 2021 Plaintiff had a missed call from phone number (949) 247-2807. Defendant's representative left a message stating, "This is Brian again with Student Services."

53. On February 2, 2021 Plaintiff had a missed call from phone number (949) 267-3589. Defendant's representative left a message stating, "Yeah this is Brian again with Student Services."

54. Between January 29, 2021 and January 30, 2021 Plaintiff received six phone calls from (915) 562-9266 soliciting student loan services that dropped before the Plaintiff could complete the process of filling out an application.

55. Plaintiff received multiple calls from a variety of spoofed caller ID's that were initiated using an automated telephone dialing system. The calls were on behalf of Defendant Summit.  The calls generally had a delay of 3-4 seconds of dead air before an audible tone connected the Plaintiff to a representative, indicating the calls were initiated using an ATDS. The Plaintiff

received at least 24 calls and texts in eight (8) days.

56. Each and every call was initiated using a spoofed caller ID, and each and every telemarketer

the Plaintiff spoke with failed to properly identify themselves and the parties they were

calling on behalf of.

57. Plaintiff received the following calls and texts from the Defendants (Table A).

| Call Phone Number | Name on Caller ID | Date | Time |
|---|---|---|---|
| 954-628-5930 | UNKNOWN NAME | 1/26/2021 | 11:35 AM |
| 915-562-8966 | UNKNOWN NAME | 1/29/2021 | 2:01 PM |
| 949-247-2807 | UNKNOWN NAME | 1/29/2021 | 3:38 PM |
| 915-562-8966 | UNKNOWN NAME | 1/29/2021 | 4:49 PM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 9:59 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 8:56 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 10:03 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 10:04 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 1:32 PM |
| 915-324-6895 | UNKNOWN NAME | 2/1/2021 | 10:45 AM |
| 915-324-6895 | UNKNOWN NAME | 2/1/2021 | 12:46 PM |
| 915-324-6895 | UNKNOWN NAME | 2/1/2021 | 4:21 PM |
| 760-378-8490 | UNKNOWN NAME | 2/1/2021 | 5:15 PM |
| 760-378-8490 | UNKNOWN NAME | 2/1/2021 | 5:54 PM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 8:56 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:31 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:31 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:33 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:42 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:43 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:55 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 10:00 AM |
| 954-628-5930 | UNKNOWN NAME | 2/2/2021 | 1:56 PM |
| 949-267-3589 | UNKNOWN NAME | 2/2/2021 | 5:39 PM |

58. Each and every call was placed without the maintenance of an internal do-not-call policy.

Each and every call failed to identify the telemarketers and parties they were calling on

behalf of. Each and every call was placed without training their agents/employees on the use

9

of an internal do-not-call policy.

59. Mr. Callier has a limited data plan. Incoming text messages chip away at his monthly allotment.

60. Mr. Callier has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

61. No emergency necessitated the calls

62. Each call was sent by an ATDS.

63. On information and belief, the Defendants did not have a written do-not-call policy while it was sending Mr. Callier the unsolicited calls

64. On information and belief, the Defendants did not train its agents who engaged in telemarketing on the existence and use of any do-not-call list.

### Vicarious Liability of the Sellers

65. These parties are vicariously liable under the theories of actual authority, apparent authority, and ratification, and as well as liable because any other result would impair the underlying purpose of the TCPA.

66. Defendant Summit is the liable party as the direct beneficiary of the illegal telemarketing calls as they stood to gain the Plaintiff as a client and quoted the Plaintiff their services in obtaining student loan forgiveness.

67. The application shows that the beneficial party who was gaining customers was Summit Horizon Financial Services.

68. Defendant Summit authorized telemarketers to generate prospective customers. Defendant Summit hired telemarketers to promote its products and services. Defendant Summit's integration of robocalling into its sales process was so seamless that it appeared to an outside

party like Plaintiff that the telemarketer was the telemarketing department of Defendant Summit.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT EFFECT AND PURPOSE OF THE TCPA

69. As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

70. The entity in the application for "student loan forgiveness" should be deemed the beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third party telemarketer's compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

71. Defendants' calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

72. Defendants' calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

73. Defendants' calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

74. Defendants' calls harmed the Plaintiff by intruding upon Plaintiff's seclusion.

75. The Plaintiff has been harmed, injured, and damages by the calls including, but not limited

to:

- Reduced Device Storage space

- Reduced data plan usage

- Invasion of privacy

- Lost time tending to text messages

- Decreased cell phone battery life

- More frequent charging of my cell phone resulting in reduced enjoyment and usage of my
  cell phone

- Reduced battery usage

- Annoyance

- Frustration

- Anger

## The Plaintiff's cell phone is a residential number

76. The calls were to the Plaintiff's cellular phone 915-245-4374, which is the Plaintiff's

personal cell phone that he uses for personal, family, and household use. The Plaintiff

maintains no landline phones at his residence and has not done so for at least 10 years and

primarily relies on cellular phones to communicate with friends and family. The Plaintiff also

uses his cell phone for navigation purposes, sending and receiving emails, timing food when

cooking, and sending and receiving text messages. The Plaintiff further has his cell phone

registered in his personal name, pays the cell phone from his personal accounts, and the

phone is not primarily used for any business purpose.

**Violations of the Texas Business and Commerce Code 305.053**

77. The actions of the Defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violate 47 USC 227(b). The calls by the defendants violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

78. The calls by the Defendants violated Texas law by spoofing the caller ID's per 47 USC 227(e) which in turn violates the Texas statute.

## I.      FIRST CLAIM FOR RELIEF

**(Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))**

**(Against All Defendants)**

1.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent.

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

5.      Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

## II.  SECOND CLAIM FOR RELIEF

### (Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))

### (Against All Defendants)

1.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

      a.      a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1); [2]

      b.      training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2); [3] and,

      c.      in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4). [4]

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

5.      Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and AFS's name in the solicitations.

### III. THIRD CLAIM FOR RELIEF:

#### Violations of The Texas Business and Commerce Code 305.053

1.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the Defendants jointly and severally as follows:

A.      Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.      An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.      An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for 24 calls.

E.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F.      An award to Mr. Callier of damages, as allowed by law under the TCPA;

G.      An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

H.      Such further relief as the Court deems necessary, just, and proper.

February 4, 2021                        Respectfully Submitted,

Brandon Callier
Plaintiff Pro-se
6336 Franklin Trail
El Paso, TX 79912
Callier74@gmail.com

16