RECEIVED

JUN 0 9 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
              DEPUTY CLERK

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| **BRANDON CALLIER,** § | |
| § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **No. EP-21-CV-00023-KC** |
| § | |
| **SUMMIT HORIZON FINANCIAL SERVICES,** § | |
| **LLC,** a Georgia Limited Liability Company and § | |
| **MORRIS LOBE** § | |
| § | |
| **Defendants.** § | |
| § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

NOW COMES PLAINTIFF BRANDON CALLIER with his First Amended Complaint

herein and alleges and states as follows:

## PARTIES

1. The Plaintiff is BRANDON CALLIER, a natural person, and was present in Texas for all

   calls, in this case in El Paso County.

2. Defendant SUMMIT HORIZON FINANCIAL SERVICES, LLC ("Summit") is a Georgia

   Limited Liability Company and can be served via registered agent INCORP Services, Inc. at

   9040 Roswell Road, Suite 500, Atlanta, Georgia, 30350.

3. Defendant MORISS LOBE ("Lobe") is a natural person, resident of Georgia, and the Chief

   Executive Officer of Summit Horizon Financial Services, LLC and can be served at 503 E.

   Green Street, Bainbridge, Georgia 39819.

## JURISDICTION AND VENUE

4. <u>Jurisdiction.</u>  This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

5. **Personal Jurisdiction.**  This Court has general personal jurisdiction over the defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff. Defendant Lobe purposefully directed or conspired to direct unlawful robocalls into the forum state.

6. **Venue.**  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

7. This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above-named defendants to the Plaintiff, a Texas resident.

**THE TELEPHONE CONSUMER PROTECTION**

**ACT OF 1991, 47 U.S.C. § 227**

8. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

9. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

10. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

11. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

12. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

13. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

14. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

nuisance and invasion of privacy than live solicitation calls and can be costly and
inconvenient.

15. The FCC also recognizes that "wireless customers are charged for incoming calls whether
   they pay in advance or after the minutes are used." *In re Rules and Regulations
   Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

16. The FCC requires "prior express written consent" for all autodialed or prerecorded
   telemarketing robocalls to wireless numbers and residential lines.  In particular:[A]
   consumer's written consent to receive telemarketing robocalls must be signed and be
   sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the
   consequences of providing the requested consent, *i.e.*, that the consumer will receive future
   calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having
   received this information, agrees unambiguously to receive such calls at a telephone number
   the consumer designates. In addition, the written agreement must be obtained without
   requiring, directly or indirectly, that the agreement be executed as a condition of purchasing
   any good or service.

17. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
   27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC
   regulations "generally establish that the party on whose behalf a solicitation is made bears
   ultimate responsibility for any violations." *In the Matter of Rules and Regulations
   Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

18. The FCC confirmed this principle in 2013, when it explained that "a seller … may be held
   vicariously liable under federal common law principles of agency for violations of either
   section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the*

*Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

19. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

20. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code 305.053

21. The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

22. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

### The Texas Business and Commerce Code 302.101

23. The Texas Business and Commerce Code requires sellers to obtain a registration certificate from the Office of the Secretary of State in order to make telephone solicitations from Texas or to consumers located in Texas.

24. Plaintiff may seek damages under Texas law for violations of § 302.101 of up to $5000 per violation, reasonable costs of prosecuting the action, court costs, investigation costs,

deposition costs, witness fees, and attorney's fees.

## FACTUAL ALLEGATIONS

25. Plaintiff's number has been on the national Do Not Call registry for 17 years.

26. Defendants do not have a solicitation registration on file with the Texas Secretary of State.

27. Defendant Lobe controls and dominates Summit Horizon Financial Services, LLC and authorized the telemarketing calls to Plaintiff, and either directly or indirectly controlled the persons who initiated the calls.

28. Defendant Lobe allowed the telemarketers to access information and systems within their control for the purposes of marketing Defendant Horizon's services.

29. Defendant Lobe approved, wrote or reviewed the script used by the telemarketers or Summit Horizon employees who initiated the calls.

30. Jane Does initiated the calls to Plaintiff pursuant to a contract or agreement with Summit Horizon, LLC the terms of which include payments and compensation to telemarketers that was approved by Defendant Lobe.

31. Defendant Lobe purposely directed telemarketing calls to be made to residents of Texas and had direct, personal participation in causing the illegal telephone calls to be made.

32. The Plaintiff has received at least 24 calls and texts over eight (8) days to his cell phone, 915-245-4374 without consent and not related to an emergency purpose, soliciting the "Student Loan Forgiveness" products and services of Defendant Summit.

33. The Plaintiff did not want or need student loan forgiveness. However, in order to cease harassment from the anonymous robocallers, such as the Defendants, after 13 phone calls Plaintiff finally told the representative he needed student loan forgiveness for the sole purpose of identifying who was calling and/or the company who was responsible for calling.

34. None of the telemarketers identified they worked for a company other, and through information and belief, the telemarketers were employees of Defendant Summit.

35. On one such phone call Plaintiff received a phone call from Defendants who pretended to be part of the United States Department of Education.

36. On February 1, 2021, Plaintiff received a phone call showing (915) 324-6895 on the caller ID.  Plaintiff answered the phone and said hello three times before the call was connected to an agent.

37. Defendant's agent asked Plaintiff personal questions such as his date of birth to gather information in an attempt to access Plaintiff's federal account at Studentaid.gov.

38. Defendant's agent reset Plaintiff's Studentaid.gov password without permission by causing a verification code to be sent via text message to Plaintiff's cell phone and asking Plaintiff to read the verification code to the Defendant's agent.

39. The Defendant's agent used this verification code to access the Plaintiff's Studentaid.gov account without Plaintiff's knowledge or permission.

40. Defendants did not tell Plaintiff the reason for the verification code being sent to Plaintiff or why they needed Plaintiff to tell them the verification code.

41. Defendants accessed Plaintiff's account and viewed his personal information without permission in an attempt to trick Plaintiff into hiring Defendants.

42. The Defendant's agent then provided Plaintiff with the username and password she had just changed on Plaintiff's account.

43. Defendant's agent then said they were going to connect Plaintiff to a "financial advisor" and asked Plaintiff to remain on the call and not hang up.

44. Plaintiff was then transferred to "Ron" who said he was a supervisor.

45. "Ron" then took Plaintiff's information and attempted to enroll Plaintiff in the Defendant's services by asking Plaintiff for his income, marital status, family size, defendants, monthly student loan payment and whether Plaintiff could afford the monthly payment.

46. "Ron" informed Plaintiff he had a "payment plan for him based on his income and family size."

47. "Ron" told the Plaintiff "The first three months you have to pay $500 for three months and after that your payment will become $634."

48. "Ron" did not disclose to Plaintiff the three $500 payments would be made to Defendant Summit and incorrectly led Plaintiff to believe the payments would be applied to his student loan balance.

49. "Ron" then asked Plaintiff to provide his credit card information so he could send Plaintiff a contract. Plaintiff gave the information to "Ron."

50. "Ron" then sent Plaintiff a contract from Defendant Summit. It was at this point Plaintiff learned who was behind the calls. At no time during any of the phone calls did the Defendant's agents correctly identify who they were calling on behalf of.

51. Plaintiff read the contract and discovered the three $500 payments the Defendant's wanted Plaintiff to make would be going to Defendant Summit and not applied to his student loan balance.

52. Plaintiff told "Ron" he needed to review the contract and would "get back with you."

53. Plaintiff received phone calls from equipment that had to capacity to store and produce numbers using a random or sequential number generator in order to produce phone numbers with 915 area codes that availed themselves in Plaintiff's home state.

54. None of the telemarketers knew Plaintiff's name during the first 13 calls indicating a random

or predictive dialer was used to generate the calls.

55. After Plaintiff pretended to have interest in Defendant's services Plaintiff began to receive follow up solicitation calls from direct dialed numbers with 760 area codes.

56. On February 1, 2021, Plaintiff received a phone call from phone number (760) 378-8490. Plaintiff answered the phone and was connected to "Jennifer." "Jennifer" asked Plaintiff to remain on the call while she connected him to "Ron."

57. On February 1, 2021, Plaintiff received a phone call from phone number (786) 688-7656. Plaintiff answered the phone and said hello before being connected to "Frank."

58. Frank said "This is Frank with your student loan company. You have been speaking to my representative Ron. We're going to complete your verification."

59. On February 2, 2021 Plaintiff received four phone calls and five text messages from "Ron" using phone number (760) 378-8490 attempting to get Plaintiff to sign the contract. Plaintiff told "Ron" he would return the contract if he were interested.

60. On February 2, 2021 Plaintiff received a phone call from (954) 328-5930.

61. Plaintiff answered the phone and said hello three times before there was an audible beep and Plaintiff was connected to "Rachel" who said she was "the head supervisor at the Student Loan Advocates Office."

62. On January 26, 2021 Plaintiff received a missed call from (954) 628-5930.

63. "Rachel" solicited Plaintiff for Defendant's services.

64. On January 29, 2021 Plaintiff had a missed call from phone number (949) 247-2807. Defendant's representative left a message stating, "This is Brian again with Student Services."

65. On February 2, 2021, Plaintiff had a missed call from phone number (949) 267-3589.

Defendant's representative left a message stating, "Yeah this is Brian again with Student Services."

66. Between January 29, 2021, and January 30, 2021 Plaintiff received six phone calls from (915) 562-9266 soliciting student loan services that dropped.

67. Defendant Lobe directed or conspired to direct unlawful robocalls and calls attempting to defraud Plaintiff and other Texas residents in the forum state.

68. Telemarketers access Defendant Summit's systems and directly input applications and generate contracts on behalf of Defendant Summit.

69. Plaintiff received multiple calls from a variety of spoofed caller ID's that were initiated using an automated telephone dialing system. The calls were on behalf of Defendant Summit. The calls generally had a delay of 3-4 seconds of dead air before an audible tone connected the Plaintiff to a representative, indicating the calls were initiated using an ATDS. The Plaintiff received at least 24 calls and texts in eight (8) days.

70. Each and every call was initiated using a spoofed caller ID, and each and every telemarketer the Plaintiff spoke with failed to properly identify themselves and the parties they were calling on behalf of.

71. Plaintiff received the following calls and texts from the Defendants (Table A).

| Call Phone Number | Name on Caller ID | Date | Time |
|---|---|---|---|
| 954-628-5930 | UNKNOWN NAME | 1/26/2021 | 11:35 AM |
| 915-562-8966 | UNKNOWN NAME | 1/29/2021 | 2:01 PM |
| 949-247-2807 | UNKNOWN NAME | 1/29/2021 | 3:38 PM |
| 915-562-8966 | UNKNOWN NAME | 1/29/2021 | 4:49 PM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 9:59 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 8:56 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 10:03 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 10:04 AM |
| 915-562-9266 | UNKNOWN NAME | 1/30/2021 | 1:32 PM |
| 915-324-6895 | UNKNOWN NAME | 2/1/2021 | 10:45 AM |
| 915-324-6895 | UNKNOWN NAME | 2/1/2021 | 12:46 PM |
| 915-324-6895 | UNKNOWN NAME | 2/1/2021 | 4:21 PM |
| 760-378-8490 | UNKNOWN NAME | 2/1/2021 | 5:15 PM |
| 760-378-8490 | UNKNOWN NAME | 2/1/2021 | 5:54 PM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 8:56 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:31 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:31 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:33 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:42 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:43 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 9:55 AM |
| 760-378-8490 | UNKNOWN NAME | 2/2/2021 | 10:00 AM |
| 954-628-5930 | UNKNOWN NAME | 2/2/2021 | 1:56 PM |
| 949-267-3589 | UNKNOWN NAME | 2/2/2021 | 5:39 PM |

72. Each and every call was placed without the maintenance of an internal do-not-call policy. Each and every call failed to identify the telemarketers and parties they were calling on behalf of. Each and every call was placed without training their agents/employees on the use of an internal do-not-call policy.

73. Mr. Callier has a limited data plan. Incoming text messages chip away at his monthly allotment.

74. Mr. Callier has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

75. No emergency necessitated the calls

76. Each call was sent by an ATDS.

77. On information and belief, the Defendants did not have a written do-not-call policy while it
was sending Mr. Callier the unsolicited calls

78. On information and belief, the Defendants did not train its agents who engaged in
telemarketing on the existence and use of any do-not-call list.

## BASIS FOR LIABILITY

79. Plaintiff alleges that even if Defendants claim they did not make the TCPA violating
robocalls to Plaintiff directly, Defendants are liable for the TCPA violating robocalls under
the following theories of liability: (1) Direct Liability, (2) Actual Authority, (3) Apparent
Authority, (4) Ratification, (5) Acting in Concert and (6) Joint Enterprise.

## DIRECT LIABILITY

80. The Defendants' scheme involves the use of illegal robocalling to promote their services.

81. Defendants' practice of outsourcing its robocalling to a third-party company does not absolve
them form direct liability under the TCPA.

82. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that
sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities
> to unsupervised third parties would leave consumers in many cases without an effective
> remedy for telemarketing intrusions. This would particularly be so if the telemarketers
> were judgment proof, unidentifiable, or located outside the United States, as is often the
> case. Even where third-party telemarketers are identifiable, solvent, and amendable to
> judgment, limiting liability to the telemarketer that physically places the calls would
> make enforcement in many cases substantially more expensive and less efficient, since
> consumers (or law enforcement agencies) would be required to sue each telemarketer
> separately in order to obtain effective relief. As the FTC noted, because "[se]ellers may
> have thousands of 'independent' telemarketers, suing one or a few of them is unlikely to
> make a substantive difference for consumer privacy.

May 2013 FCC Ruling, 28 FCC Rcd at 65 (¶ 37) (internal citations omitted).

## AGENCY ALLEGATIONS

83. The May 2013 FCC Ruling rejected a narrow view of TCPA liability including the assertion that a seller requires finding a formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107

84. Prior to conducting discovery in this litigation, due to the anonymous nature of robocalling, Plaintiff has no way to identify the exact relationship between Defendants and robocallers.

85. However, for the purposes of TCPA liability, Plaintiff is not expected to know this information at the pleading stage.

86. The May 2013 Ruling states that called parties may obtain "evidence of these kinds of relationships...through discovery, if they are not independently privy to such information." *Id* at 6592-593 (¶ 46).

## ACTUAL AUTHORITY

87. Defendants authorized John Doe third-party telemarketers to generate perspective customers. Defendants entered into contracts or agreements with third-party telemarketers to solicit their products and services.  The John Doe telemarketers' integration of robocalling into the sales process was so seamless that it appeared to an outside party like Plaintiff that the John Doe telemarketers were the telemarketing department of the Defendants.

88. John Doe telemarketers were hired by Defendants, and acted in concert with the Defendants, which permitted Defendants to enjoy the benefits of mass robocalling while moving the illegal activity "outside their purview."

89. Defendants authorized John Doe telemarketers to generate prospective customers. Defendants hired John Doe telemarketers to promote Defendants' products pursuant to

robocalling. Defendants' integration of robocalling into its sales process was so seamless that it appeared to an outside party like Plaintiff that the John Doe telemarketers were the telemarketing department of the Defendants.

90. Accordingly, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12931, 12397 (¶ 13)(1995).

91. In their January 4, 2008, ruling the FCC reiterated that a company on whose behalf a telephone call made bears the responsibility for any violations. Id. (specifically recognizing "on behalf of" in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

92. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

93. John Doe telemarketers solicited Plaintiff on behalf of Defendants and had actual authority from Defendants to solicit Plaintiff by using robocalling.

94. The actual authority of the John Doe telemarketers will be illustrated by the compensation paid to the John Doe telemarketers by the Defendants.

## APPARENT AUTHORITY

95. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority

> [A]pparent authority may be supported by evidence that the seller allows the outside entity access to information and systems that normally would be within the sellers

exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed that outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd at 6592 (¶ 46).

96. Defendants authorized John Doe telemarketers to generate prospective customers for them.

97. The integration of their sales efforts with robocalling by Defendants was so seamless it appeared to Plaintiff that the John Doe telemarketers and Defendants all appeared to be acting together as the same company.

98. Plaintiff reasonably believed and relied upon the fact that John Doe telemarketers received permission to sell, market, and solicit Defendants' products.

99. The actual authority of the John Doe telemarketers will be illustrated by the compensation paid to the John Doe telemarketers by the Defendants.

## RATIFICATION

100.    Defendants knowingly and actively accepted business that originated through illegal robocalls placed by John Doe telemarketers.

101.    By accepting these contracts, soliciting and executing contracts with the robocall victims, Defendants "manifest[ed] assent or otherwise consent[ed]…to act" on behalf of John Doe telemarketers, as described in the Restatement (Third) of Agency.

102.    Defendants ratified the John Doe telemarketers' violations by knowingly accepting the

benefit of new customers despite that the customers were generated through illegal sales calls.

103.    Defendants took advantage of the violations be having sales people solicit prospective customers while turning a blind eye to the way the potential customer was identified.

104.    Defendants ratified that John Doe telemarketers TCPA violations by being willfully ignorant of the violations or by being aware or by being aware that such knowledge was lacking.

105.    Defendants caused John Doe telemarketers to have the actual authority of Defendants. Restatement § 4.01 cmt. b.

## JOINT ENTERPRISE

106.    Defendants had tacit agreements or approved after the fact with John Doe telemarketers for the marketing of their products pursuant to the John Doe telemarketers illegal robocalls.

107.    Defendants were part of a common enterprise and had a community of interest in marketing and advertising "Student loan forgiveness" from Defendant Summit.

108.    Defendants had equal right to control the conduct thereof by specifying the type of people to be called and the questions to be asked to prospective customers.

109.    Defendants had a duty to exercise due care when marketing their products.

110.    Defendants' violation of the TCPA is negligence per se.

111.    Because of Defendants' negligence, Plaintiff suffered actual and statutory damages.

112.    Defendants are jointly and severally liable for the resulting damage caused by the third party telemarketers TCPA violating telephone calls.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT

## EFFECT AND PURPOSE OF THE TCPA

113.   As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

114.   The entity in the application for "student loan forgiveness" should be deemed the beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third party telemarketer's compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES

## AS A RESULT OF THE CALLS

115.   Defendants' calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

116.   Defendants' calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

117.   Defendants' calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

118.   Defendants' calls harmed the Plaintiff by intruding upon Plaintiff's seclusion.

119.   The Plaintiff has been harmed, injured, and damages by the calls including, but not limited to:

• Reduced Device Storage space

• Reduced data plan usage

17

- Invasion of privacy

- Lost time tending to text messages

- Decreased cell phone battery life

- More frequent charging of my cell phone resulting in reduced enjoyment and usage of my cell phone

- Reduced battery usage

- Annoyance

- Frustration

- Anger

### The Plaintiff's cell phone is a residential number

120.   The calls were to the Plaintiff's cellular phone 915-245-4374, which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

121.   In Strange v ABC Co. the Court noted:

> "Some courts who have evaluated similar TCPA claims have dismissed them after concluding that Section 227(c)(5) does not encompass calls to cell phones, while other courts have required a plaintiff to present evidence establishing that he used his cell phone for residential purposes. See Strange v. Doe #1, No. 19-1096, 2020 U.S. Dist. LEXIS 8476, 2020 WL 2476545, *3 (W.D. La. May 12, 2020) (collecting cases). The Federal Communications Commission, which is the

agency responsible for the TCPA's implementation, has observed this disconnect between the treatment of residential phones and has stated:

[W]e believe it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections. As indicated above, Congress afforded wireless subscribers particular protections in the context of autodialers and prerecorded calls. In addition, although Congress expressed [*10] concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers. Therefore, we conclude, that wireless subscribers may participate in the national do-not-call list. As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers." Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.

In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039 (2003) (footnotes omitted).

From this, the Court finds persuasive authority that plaintiffs, like Strange, who register their cell phones with do-not-call registries are presumed to be residential subscribers. However, the Court finds that Strange is still required to put forth evidence supporting this presumption, as he is seeking enforcement of section 227(c)(5) against the Defendants. See Cunningham [*11] v McDonald, No. 3:15-CV-215, 2018 U.S, Dist. LEXIS 201403, 2018 WL 6737418, *2 (M.D. Tenn. Nov. 5, 2018) ("While a person utilizing a cellular phone may fall within the definition of a 'residential telephone subscriber' under the act, Plaintiff's pleadings allege only that calls were made to his cellular phone and he has pled no facts or offered evidence sufficient for the court to draw the conclusion that he has

stated a cause of action under (c)(5)"); <u>Stevens-Bratton v. TruGreen, Inc.</u>, 437 F. Supp. 3d 648, 655 (W.D. Tenn. Feb. 4, 2020) ("Courts have interpreted the 'residential telephone subscriber' element to require proof the number called was used for 'residential purposes,' ") <u>Cunningham v. Rapid Capital Funding, LLC/RCF</u>, No. 3:16-CV-2629, 2017 U.S. Dist. LEXIS 136951, 2017 WL 3574451, *3 (M.D. Tenn. July 27, 2017) ("While this Court has suggested that calls to a cell phone may be construed as calls to a residential telephone, the plaintiff must plead facts showing the cell phone is used for *residential purposes*." (emphasis in original)). Thus, Strange cannot prevail under Section 227(c)(5) without sufficient proof that he used his cell phone for residential purposes." *Strange v. ABC Co.*, No. 19-1361, 2021 U.S. Dist. LEXIS 38882 *; 2021 WL 798870.

122.    47 C.F.R. § 64.2305(b) defines a business subscriber as a subscriber to a telephone exchange service for businesses.

123.    47 C.F.R. § 64.2305(d) defines a residential subscriber as a subscriber to a telephone exchange that is not a business subscriber.

124.    Plaintiff's cell phone is not a business subscriber and is therefore a residential subscriber.

### Violations of the Texas Business and Commerce Code 305.053

125.    The actions of the Defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violate 47 USC 227(b). The calls by the defendants violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

126.    The calls by the Defendants violated Texas law by spoofing the caller ID's per 47 USC 227(e) which in turn violates the Texas statute.

### I.      FIRST CLAIM FOR RELIEF

**(Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))**

**(Against All Defendants)**

1.        Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.        The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent.

3.        Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

4.        Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

5.        Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

## II.  SECOND CLAIM FOR RELIEF

**(Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))**

**(Against All Defendants)**

1.        Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

a.      a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1);[2]

b.      training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2);[3] and,

c.      in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

5.      Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and AFS's name in the solicitations.

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

### III.  THIRD CLAIM FOR RELIEF:

### Violations of The Texas Business and Commerce Code 305.053

1.        Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.        The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

3.        Mr. Callier is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

4.        Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

### IV.  FOUTH CLAIM FOR RELIEF

### Violations of The Texas Business and Commerce Code 302.101

1.        Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

2.        §302.101 of the Texas Business & Commerce Code prohibits sells from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

3.  Defendant violated § 302.101 of the Texas Business & Commerce Code when its

representatives engaged in continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

    4.  §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5000 for each violation. Furthermore, §302.302(d) provides that the party bringing the action is also entitled to recover all reasonable costs of prosecuting the action, including court costs, investigative costs, deposition expenses, witness fees and attorney fees.

## V. PRAYER FOR RELIEF

    WHEREFORE, Plaintiff Brandon Callier prays for judgment against the Defendants jointly and severally as follows:

    A.    Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

    B.    A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

    C.    An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

    D.    An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for 24 calls.

    E.    An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053;

    F.    An award of $5000 per call in statutory damages arising from violations of Texas Business and Commerce code 302.101;

    G.    An award to Mr. Callier of damages, as allowed by law under the TCPA;

H.    An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law

and equity

I.    Such further relief as the Court deems necessary, just, and proper.

June 9, 2021                              Respectfully Submitted,

Brandon Callier
Plaintiff Pro-se
6336 Franklin Trail
El Paso, TX 79912
Callier74@gmail.com